## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 8:04CR199 |
| vs. ) | |
| ) | **REPORT AND** |
| BILLY D. DAVIS, ) | **RECOMMENDATION** |
| ) | |
| Defendant. ) | |

This case is before the court on defendant's MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE [32]. The motion was heard on March 11, 2005 and the Transcript of the proceedings [47] was filed on March 22, 2005. The parties requested additional time to file briefs, which was granted, and the motion was deemed submitted on April 18, 2005.

The defendant, Billy D. Davis, moves the court for suppression of physical evidence and/or statements he made on January 12, 2000 and October 12, 2001. He alleges that members of the Omaha police department did not have probable cause to detain, arrest, or search him and that on both occasions he was subjected to an illegal body cavity search, all in violation of his rights under the Fourth Amendment to the United States Constitution.

### I.  JANUARY 12, 2000 ARREST

**A.  Factual Background**

David Staskiewicz testified he is a six-year employee of the Omaha police department currently assigned to the training academy. On January 12, 2000 he was working in the

metro unit on the 3:00 p.m. to 11:00 p.m. shift. He arrested Billy Davis shortly after 9:00 p.m. (133:11-134:8, 144:21).

Staskiewicz testified regarding the circumstances of the January 12, 2000 arrest. On that night, he and his partner, Ken Kanger, were on routine patrol in the area of 43rd and Redman Avenue when they observed three males in red clothing in the Cubby's parking lot. The officers observed one of the males walk up to the window of a tan car that had pulled into the parking lot. After observing the incident, the officers decided to drive in and see what was going on. Staskiewicz was concerned because the area of 43rd and Redman is known for drug, gang activity, and crime and three males dressed in red clothing can be an identifier of gang activity. Staskiewicz also noted that when someone walks up to and leans into a car in high-gang and high-drug area it is generally a drug transaction (134:7-136:5).

Staskiewicz testified that as he drove into the parking lot the male, later identified as the defendant Billy Davis, leaned into the car, looked up, saw the officers and took off running in a southerly direction (136:6-11). Kanger exited the cruiser and engaged in a foot pursuit as Staskiewicz drove around the block while he listened to Kanger on the radio as to what direction and how far they were going. Staskiewicz drove east and then south and cut off Davis in the area of Ellison Street and 43rd, in the backyard of a house (136:24-137:25). He placed Davis in handcuffs and put him in the back of the patrol car and transported him to central station (138:4-7). While in route to the central station, Davis informed the officers he was running because he had warrants (138:21-25).

Staskiewicz testified that at central station Davis was secured in a booking or interview room, which he described as an 8-by-10 foot rectangular room with a desk and four chairs (139:4-15). Kanger then asked Davis to start taking off his clothing for a strip search, which had been authorized by a superior officer (139:5-140:13). Davis complied and was cooperative and calm (140:15-22). Davis removed his shoes and took off layers of clothing from the top of his body. After removing his top, Davis removed his pants and as he started to take off his long-john underwear, a baggie containing suspected crack cocaine fell to the floor and was secured by Kanger (141:2-24). After Davis removed the rest of his clothing, the clothing was handed back to him and he got dressed again (142:17-24).

Staskiewicz testified that at that time Kanger read Davis his *Miranda* rights (Ex. 2) and Davis waived his rights and stated that he ran because he had warrants, that he had seen the police, and knew he had crack in his longjohns (142:25-143:8).

On cross-examination Staskiewicz testified that he wrote a two-page report about the incident and that Kanger signed the report (146:11-25). He also admitted that Cubby's is a convenience store and that people do not buy drugs there, but buy groceries. However, he noted he did not believe Cubby's was open at the time the three individuals were in the parking lot (149:23-150:9). He also admitted he did not see any drugs or money change hands (150:16-23), and he did not hear any conversations that took place between the parties (150:24-151:1); that all he knew was that when he pulled up an individual started running (151:7-11). He also admitted he did not interview any individuals at the scene, nor was he

informed by anyone that drug transactions or any other illegal activity was occurring in the Cubby's parking lot (153:9-19).

### B. Legal Analysis

Under *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause. *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999).

In *United States v. Arvizu*, 534 U.S. 266, 273 (2002), the Supreme Court stressed that reviewing courts must look at "the totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. "This process allows officers to drawn on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* To justify a *Terry* stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it

falls considerably short of satisfying a preponderance of the evidence standard. *Id.* at 274; *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

"Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir.), cert. denied, 516 U.S. 872 (1995). Furthermore, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

On January 12, 2000, the arresting officer saw defendant and two others in the Cubby's parking lot at 43rd and Redman, an area known for drug, gang activity, and crime. The Cubby's store was not open at the time. All three men were wearing red clothing, suggesting gang affiliation. When defendant saw the officers, he immediately took off running. "Headlong flight–wherever it occurs–is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. at 124.

Considering the totality of the circumstances, I find that the officers had reasonable suspicion to approach defendant Davis to conduct a *Terry* stop to investigate his activities in the Cubby's parking lot; however, the officers were unable to complete a typical *Terry* stop because Davis ran from the scene. During a *Terry* stop, officers can check for weapons and may take any additional steps that are reasonably necessary to protect their personal

safety and to maintain the status quo during the course of the stop. *See United States v. Watts*, 7 F.3d 122, 125 (8th Cir. 1993), *cert. denied*, 510 U.S. 1078 (1994).

After he was apprehended, Davis was placed in handcuffs and taken to the police station to be interviewed. I find that placing Davis in handcuffs was a reasonable precaution. *See United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (Using handcuffs can be a reasonable precaution during a *Terry* stop); *cf. Muehler v. Mena*, 125 S. Ct. 1465 (2005) (officers acted reasonably by detaining occupant of residence in handcuffs for two to three hours while search was in progress); *Michigan v. Summers,* 452 U.S. 692 (1981).

No reason has been proffered, however, as to the necessity of taking Davis to the police station to be interviewed. While on the way to the police station, Davis reportedly noted that there were outstanding warrants for his arrest and, at some point, was formally arrested for some reason. Although the defense does not appear to contest the point, there is no evidence showing that Davis was arrested pursuant to an outstanding warrant or that there even were any outstanding warrants for Davis' arrest.

The record does demonstrate that a *Terry* stop was appropriate in this instance; however, the officers' actions in placing Davis in the patrol car and taking him to the police station exceeded the scope of a *Terry* stop. The strip search[1] conducted at the police station

---

[1] There is no evidence tending to support Davis' assertion that he was subjected to a "body cavity search" at the police station.

-6-

also exceeded the scope of a *Terry* stop. Given the murky record on the time of, and reason for, Davis' arrest, this search cannot be justified as a search incident to arrest.

Turning to defendant's statements, the protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), "are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence,* 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

In the case at bar, Davis was undoubtedly "in custody" when he made statements to the police officers. There is no evidence, however, that he was "interrogated" before he was given his *Miranda* rights, and Officer Staskiewicz testified he could not recall whether he said anything to Davis to elicit Davis' earlier statement about the warrants (139:1-3). I find that the statements made by Davis before he was Mirandized were volunteered and were not the product of "interrogation."

At the police station, Davis was given, and waived, his *Miranda* rights. I credit Officer Staskiewicz' testimony that Officer Kanger read Davis his *Miranda* rights, see Ex. 2, and that Davis waived his rights. There is nothing in the record suggesting any coercive or improper police conduct with respect to defendant's statements.

In summary, the officers had reasonable suspicion to approach defendant Davis to conduct a *Terry* stop. Because Davis fled before the *Terry* stop was initiated, the officers were justified in detaining him at the scene; however, they took him to the police station to conduct a strip search. While Davis reportedly volunteered information that there were outstanding warrants for his arrest, the record is silent as to when and why Davis was actually arrested. The search conducted at the police station exceeded the scope of a *Terry* stop and cannot be justified as a search incident to arrest. Davis was given, and voluntarily waived, his *Miranda* rights before making any further statements to the police. For these reasons, I recommend that the motion to suppress be granted as to the crack cocaine found on Davis' person and denied as to the statements made by Davis on January 12, 2000.

## II.  OCTOBER 12, 2001 ARREST

### A.  Factual Background

David G. Rieck testified he has been employed by the City of Omaha since 1992, and that he currently serves in the special operations vice unit, where his duties include undercover activities involving narcotics and prostitution. In October of 2001 he was assigned to uniform patrol in the Northeast precinct where he answered radio calls and took care of accidents and traffic enforcement.

On October 12, 2001 Rieck was working the D shift from 5:00 PM to 2:00 AM when (66:20-23) he observed a Chevy Caprice eastbound on Ames approaching 30th Street turn into the Amoco parking lot on the southwest corner of 30th and Ames without signaling the

turn. He drove his cruiser directly behind the Chevy and turned on his top lights to get the driver's attention and initiate a traffic stop (67:9-22). As the vehicle pulled to a stop, Rieck observed three individuals in the vehicle. The individuals were identified as the driver, Bernell McCowin, the rear passenger, Billy Davis, and the right front passenger, a female whose name he does not recall (68:3-15).

Rieck testified he observed Davis, the passenger in the rear right seat, sit up, raise his rear off the seat, raise his right hand and shoulder and move them behind his back as if he was putting something underneath or behind him (69:6-24). This was significant to Rieck because as a police officer he was concerned, "that something isn't right because it's not normal for a person to do that, especially after you activate your rotaters, it appears that they're trying to conceal something." (70:8-14). Rieck testified he exited his cruiser and contacted the driver, who he arrested for being a suspended driver (70:16-72:3). After informing the driver he was under arrest for suspension and operating a motor vehicle with a suspended license, he then turned his attention to the other passengers, and requested that they exit the vehicle because the driver was under arrest and the vehicle was going to be searched (72:15-20). Both passengers exited the vehicle and sat on the curb to the west of the vehicle at which time Davis was searched (73:10-21).

Rieck testified he searched Davis for two reasons – first, because of the movements Davis made as the stop was initiated, and second, because Davis granted permission to search (74:2-13). After Davis exited the vehicle Rieck asked him his name and if he had anything

-9-

illegal on him. Davis gave his name and stated he did not have anything illegal on him. Rieck then asked Davis if it was okay for him to search him. Davis responded, "go ahead" (74:8-13). Rieck took Davis to the rear of the vehicle, placed his hands on the trunk and began the search (74:14-18). The search included a pat-down of the arms, a sweep of the chest and ribs, and the front rib-cage. Davis was wearing baggy pants so Rieck pulled the pants up to Davis' waist and straightened them out before searching the front pockets, the back pockets, and the buttocks area (74:19-25). During the search of the buttocks area, Rieck detected a "hard rock-like, almost marble object" (75:6-11). During the search Davis was cooperative and coherent (75:12-23).

Rieck testified that he then asked Davis to sit on the curb and after Davis complied, Rieck approached Hanson and told him he believed Davis was concealing narcotics in his buttocks area (76:1-7). Because he did not wish to warn Davis, he and Hanson approached Davis "very calmly" and asked him to stand up and place his hands behind his back, which Davis did (76:12-16). Because he wanted to make sure that what he had felt was not bunched up underwear or anything like that, he straightened out Davis' pants and slid his hand up the crack of Davis' buttocks, and again felt the object (77:3-11). At that time Davis became "a little bit more agitated" stating, "you can't do that, go ahead and run my name, I don't have any warrants, you don't have any right to do that." Rieck responded to try and keep Davis calm that the police were going to take Davis to the police assembly about a half block away, just to talk. Davis responded that he did not want to go and that the police did

not have a right to do what they were doing and he wasn't taking his clothes off for anybody (77:14-78:6).

Rieck testified that he told Davis he didn't want to alarm him and didn't want any trouble on the street and all the police wanted to do was to speak with him at the police assembly. Rieck testified he wanted to move to the assembly because he was concerned for Davis' safety and his own safety as the parking lot is sometimes crowded and he didn't want a crowd to build and he did not want a disturbance or physical confrontation (79:6-13).

Rieck testified Davis was transported to the assembly and as Rieck parked on the west side of the building, Davis' demeanor changed dramatically. He became highly combative (80:6-11). As Rieck exited his vehicle to get Davis out, Davis became very combative, tried to head-butt Rieck numerous times, tried to kick Rieck, and tried to leg sweep Rieck off of his feet (80:16-23). Rieck, with the assistance of Hanson, subdued Davis and moved him into the assembly where Davis cussed and used vulgar language stating that he was not taking his clothes off for anybody and that the police needed a warrant to do what they were doing (81:9-15).

Rieck testified he tried to keep Davis calm by reassuring him that they were just going to talk to him. However, as they entered the assembly building and took Davis to an interview room, Rieck observed Davis was pretty much out of control, kicking, screaming, thrashing his head about, and trying to place his hands, which were handcuffed behind his back, down his pants towards his buttocks area (82:4-12). Rieck, with the assistance of

-11-

Hanson and two other officers, subdued Davis and prevented him from putting his hands down his pants. Rieck was concerned about Davis putting his hands down his pants because through experience in narcotics he knew it is common for suspects carrying narcotics in their buttocks area and to try and destroy the evidence and push it up into their anal area (83:5-10). After Davis was subdued, Rieck left the interview room and advised his sergeant that they were going to do a strip search and to get rubber gloves (83:18-23). Rieck testified that Sergeant Edward Reyes, along with Rieck, then entered the interview room where Rieck put on the rubber gloves and retrieved narcotics from Davis' buttocks area (87:4-9). Rieck noted that because Davis' pants were quite baggy and loose-fitting, his pants were between his knees and his waist and his underwear was down below his waist, but not completely off his buttocks (87:23-88:16).

Rieck testified that Davis' underwear was down almost to the crack of his buttocks and that he did not pull them down, but rather, lifted up the waistband at the crack of the buttocks, and observed the tip of a baggie protruding from Davis' buttocks. He grabbed the tip and pulled the baggie out. Rieck observed that during the search Davis continued to kick and thrash his body about while yelling and screaming vulgarities at the police (88:17-89:1).

On cross-examination Rieck testified that when he made the traffic stop and observed Billy Davis, he did not know Davis (92:6-12). He admitted that during the stop his microphone was on, but that his camera was not on (95:15-16). He also admitted that while he did not recall which cruiser Davis was transported in, it was possible Davis was in the

caged area of his cruiser (96:12-17). He also admitted the driver of the vehicle was not taken into custody but was given a criminal citation and released (96:18-24).

On cross-examination Rieck testified that when he observed Davis' movements in the back of the Chevy he was directly behind him and he could see Davis' shoulders, neck, and head and that he observed Davis raise up to where he could see his head, shoulder, right arm, and part of his upper back (98:7-14).

On cross-examination Rieck testified that after Davis exited the vehicle he asked Davis if he had anything illegal on him and Davis responded, "no." He then asked Davis for permission to search him and Davis said "go ahead." Rieck admitted, however, that since there is no audiotape and Hanson testified he did not hear what was said, that the court would have to take his word that Davis granted him permission to search (102:10-103:13).

Rieck stated that as he conducted the search and retrieved the narcotics, Davis was handcuffed and subdued by three officers.

On redirect examination Rieck testified that handcuffing someone in the front is one of the most dangerous things you can do because the handcuffs and hands become weapons and the cuffed individual can reach and get the officer's weapon.

Carl Hanson testified he is a 4½ year employee of the Omaha police department and that at approximately 1:00 A.M. on October 12, 2001, he responded to the Amoco lot at 30th and Ames, to assist Officer David Rieck with a traffic stop (9:20-24). As he arrived, Hanson observed Rieck and three individuals outside of their vehicles (10:2-4). He was advised by

-13-

Rieck that Rick had just conducted a pat-down or a search of the parties and that Rieck suspected something was located in the buttocks area of one of the individuals, later identified as Billy Davis (12:16-23). Hanson assisted Rieck by watching Davis to ensure that Davis' hands did not go anywhere near his buttocks, while Rieck conducted the remainder of the traffic stop (13:8-11). Hanson observed that Davis was calm, was not handcuffed, but was detained (14:14-25).

Hanson further testified that after concluding the traffic stop, Rieck again approached Davis and conducted a search (15:2-8). Hanson observed Rieck stand behind Davis, pat him down, and check his buttocks area (15:9-11). At about that time Hanson learned that the driver and the other passengers from the vehicle were going to be allowed to leave the scene, but Davis was to be handcuffed and put in a cruiser. Rieck then asked Hanson to follow him to the assembly, approximately 100 yards away, which Hanson described as the Southeast assembly of the Omaha police (15:20-16:3).

Hanson testified that when he arrived at the assembly, he parked in the parking lot on the west side of the building, and observed Rieck and Davis exit Rieck's cruiser and walk into the assembly (16:24-17:5). Hanson also observed that as Davis entered the assembly he became very combative, attempted to wrestle out of Rieck's grip, and was yelling and cursing. As Davis was moved to an interview room he became even more violent and pushed the officers. Hanson and other officers then subdued Davis and took him down to the ground (18:15-22). On the ground Davis continued to kick and tried to get his hands down by his

pants while the officers tried to hold his arms up (20:7-15). The officers then wrestled Davis to a prone position on his stomach and after Sergeant Reyes entered the interview room, a search of Davis' buttocks area took place (21:5-22:20). Hanson noted Davis' pants were loose and baggy and during the fight his pants had fallen down but his boxer shorts were up (22:19-23). Hanson observed as Rieck remove a bag of crack cocaine from the area between the cheeks of Davis' buttocks. After the baggie was removed Hanson observed Davis became even more upset and physically violent which resulted in the officers using plastic flexicuffs to cuff his legs to keep him from kicking (22:25-24:5).

On cross-examination Hanson testified that on October 12, 2001 he had been an officer with the Omaha police department for only five or six months and was on probationary status (29:22-30:8). He admitted he did not write a report about the incident, noting that he believed everything was covered in Rieck's report (35:6-24). Hanson stated that he had no idea why Davis was fighting (36:13-15), and that he had never heard anyone refer to this case nor had he referred to this case as "the crack in the crack case" (37:17-24). Hanson also stated that he did not recall whether his cruiser or Rieck's cruiser was equipped with a video camera the night Davis was stopped (38:9-22).

Hanson testified on cross-examination that Rieck told him the vehicle was originally stopped because the driver failed to signal a turn (40:22-25). Hanson stated that Davis was taken to the assembly to get permission from a commanding officer for a strip search

-15-

(48:20-24). Hanson did not hear Davis consent to the search (49:5-10), nor did he hear Davis give permission to officers to seize any money (56:13-15).

On redirect examination Hanson testified that he did not hear Davis object to the search at the scene of the traffic stop (58:21-59:5), nor did he hear Rieck tell Davis the reason he was being taken in was so they could, in defense counsel's words, "look up his ass." (59:6-12; 47:8).

### B. Legal Analysis

It is uncontroverted that the vehicle in which Davis was a passenger was stopped for a traffic violation. Under *Maryland v. Wilson*, 519 U.S. 408, 415 (1997), "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Thus, it was permissible for the officers to order Davis to get out of the vehicle.

Davis did get out of the vehicle. While in the process of stopping the car, Officer Rieck had seen Davis sit up, raise his rear off the back seat, raise his right hand and shoulder and move them behind his back as if he was putting something underneath or behind him. These actions suggested to Rieck that Davis was trying to hide contraband. I find that Davis' movements provided reasonable suspicion for Rieck to conduct a *Terry* stop of Davis. I also credit Rieck's testimony that Davis consented to the search of his person.

During the initial pat-down search, Rieck detected a "hard rock-like, almost marble object" in the buttocks area. He had Davis sit on the curb while he discussed with Officer Hansen the possibility that Davis was concealing contraband. Davis, who was previously

calm, became agitated and combative when the officers continued the search of his buttocks area. Davis was taken to the police assembly to avoid a physical confrontation on the street. At the police assembly, Davis became physically violent, resisting all efforts to search his person, and bolstering the officers' suspicions that there was an illegal substance concealed on Davis' person.

During the struggle, Davis' baggy pants fell between his knees and his waist; his underwear was down below his waist, but not completely off his buttocks. Rieck lifted up the waistband and observed the tip of a baggie protruding from Davis' buttocks. Although the officers originally intended to seek permission to conduct a strip search, the defendant's clothing was not even removed, and there is absolutely no evidence that a body-cavity search was conducted.

Considering the totality of the circumstances, by the time Officer Rieck transported Davis to the police assembly, I find that the officers had probable cause to believe Davis was concealing an illegal substance on his person. Although the Douglas County District Court concluded otherwise, that decision is not binding on this court. *See United States v. Friend*, 50 F.3d 548, 551 (8th Cir. 1995).

## RECOMMENDATION

For the reasons discussed herein,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS ILLEGALLY OBTAINED EVIDENCE [32] be granted in part, and denied in part, as follows:

1. The motion should be granted as to the crack cocaine seized on January 12, 2000.

2. The motion should be denied in all other respects.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" on or before **June 3, 2005.** The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED May 18, 2005.**

                **BY THE COURT:**

                **s/ F.A. Gossett**
                **United States Magistrate Judge**